UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

QC PROPERTIES, LLC,

                              Plaintiff,

v.                                    **COMPLAINT**

                                    **JURY TRIAL DEMANDED**

ANDREW M. CUOMO, in his Official
Capacity As Governor of the State of New York,
LETITIA JAMES, ESQ., in her Official Capacity
 As Attorney General of the State of New York,       Index No. _____
HOWARD A. ZUCKER, M.D., J.D. in his Official
Capacity As Commissioner of Health of New York,
and The STATE OF NEW YORK,

                             Defendants.

_____

        Plaintiff QC Properties, LLC ("QC" and/or "Plaintiff"), by and through its attorneys, Duke, Holzman, Photiadis & Gresens LLP, for its complaint against defendants Andrew M. Cuomo ("Governor"), Letitia James ("AG"), Howard A. Zucker, M.D., J.D., ("DOH") and the State of New York ("NYS") (collectively "Defendants"), allege as follows:

### SUMMARY OF THE COMPLAINT

        1.     Plaintiff files this Complaint for declaratory judgment, injunctive relief, damages and other relief to vindicate its rights under the United States and New York Constitutions.

2.     By this Complaint, Plaintiff challenges Defendants' unconstitutional and unlawful distinctions in allowing certain places of public assembly to reopen, while requiring movie theatres to remain closed.  COVID-19 represents a serious public health risk, and Plaintiff supports fair and reasonable actions by the government to address that risk.   However, the government-mandated total closure of movie theatres is neither fair nor reasonable, and is instead a violation of Plaintiff's First Amendment rights of freedom of speech and freedom of expression, Equal Protection of the laws, Due Process under the law, and is a Taking of property without just compensation.

3.     In addition, Plaintiff challenges the Governor's Executive Orders issued under sections 28, 29 and 29-a of N.Y. Executive Law, Article 2-B, on the grounds that such statutes are unconstitutional because they violate the separation of powers and unlawfully delegate to the executive branch the legislative powers of state government, and, allow the exercise of such powers indefinitely.

4.     The expansiveness of authority concentrated in one single public official, the Governor, is a violation of the separation of powers and non-delegation doctrine.  As the Michigan Supreme Court recently held:

> "Although singular assertions of governmental authority may sometimes be required in response to a public emergency –– and the present pandemic is clearly such an emergency—the sheer magnitude of the authority in dispute, as well as its concentration in a single individual, simply cannot be sustained within our constitutional system of separated

powers."  In re Certified Questions from the United States
District Court, Western District of Michigan, Southern
Division:  Midwest Institute of Health, PLLC, et. al. v. Governor
of Michigan, [No. 161492 (USDC-WD: 1:20-cv-414), October
2, 2020 Slip op. at p.48]

5.     "'The principle function of the separation of powers . . . is to . . .
protect individual liberty.'"  Id. at p.21, citing Clinton v. City of New York, 524
U.S. 417, 482 (1998) (Breyer, J., dissenting).   "[A]s Montesquieu explained,
'[w]hen the legislative and executive powers are united in the same person, or in
the same body of magistrates, there can be no liberty; . . . .'"  Id. at p.22, citing
Baron de Montesquieu, *The Spirit of the Laws* (London: J. Nourse and P. Vaillant,
1758), Book XI, ch. 6, p. 216.

6.     On March 2, 2020, the N.Y.S. Legislature rushed through in record
time with a message of necessity from the Governor, a bill amending Section 29-
a of the Executive Law, to increase the Governor's powers to deal with a broad
array of emergencies.   The amendment permits the Governor to: "issue any
directive during a state disaster emergency. . . ."  Upon information and belief,
there was no debate, no prior public notice and no media coverage and the bill
was passed while everyone in the state was sleeping.

7.     The Governor issued his first Executive Order 202 on March 7, 2020
which modified a number of state statutes and regulations.  Then, on March 16,
2020, the Governor exercised the broad unconstitutional powers allegedly

granted to him by the amendment to Exec. Law § 29-a, and issued Executive

Order 202.3 which declared that Plaintiff's businesses must cease all operations

and shut down because they were classified as "non-essential"; this order was

issued without due process.  A copy of Executive Order 202.3 is attached hereto

as **Exhibit A**.  At that time, only businesses declared "essential" by the Governor

were permitted to remain open.

8.     Since that time, however, Defendants have allowed various sectors

of the New York economy to reopen including other businesses which are

similarly situated to Plaintiff.  This includes, but is not limited to, retail shopping

malls, gyms and fitness centers, casinos, restaurants and bars, places of

worship, and almost all other types of business operations, whether or not such

places are considered "essential".  ***To date, however, Defendants have refused

to permit the opening of theaters***.

9.     Defendants' decisions and reasoning lack transparency.

Defendants have not disclosed or identified the alleged "science or data" they

claim justifies their decision to leave shuttered ***only the movie theater

industry***.  The Governor's initial Executive Order was premised on the perceived

need to "flatten the curve" so as to avoid overwhelming the state's hospitals and

healthcare centers, not to eradicate the virus.  Indeed, the curve has been

flattened for more than four (4) months, with the published infection rate as low

as 1.22% as of October 5, 2020.  The Governor's NYS Coronavirus Update Email

reported 636 hospitalizations, and 933 positive tests out of 76,404 tests on October 5th.  A copy of the Governor's email update for October 5, 2020 is attached hereto as **Exhibit B.**  Despite this, the Governor has thus far refused to allow theaters to reopen.

10.     Over the past six (6) months, the Governor's Executive Orders have shuttered civil society, placed 19.5 million people under house arrest, and taken jobs away from millions of people, all without due process of law.  The Defendants have not disclosed their so-called "data or methodology" used to purportedly justify their extreme and arbitrary actions.  And, even though the Governor has ***graciously*** allowed some businesses to reopen, he continues to wield dictatorial powers even though the curve has long been flattened.

11.     Plaintiff QC is the owner of Quaker Crossing Retail Center, in Orchard Park, New York.  Regal Cinemas, Inc. ("Regal") is one of QC's anchor tenants.  Pursuant to the written lease between the parties, Regal is obligated to pay monthly rent to QC of $133,454 for the year 2020, as well as a percentage of Gross Sales, CAM and taxes.  Regal has refused to pay such rent obligations due to the shut-down.  QC's school taxes in the amount of $187,000 are due October 15.  Plaintiff QC can no longer afford to have its tenants, including Regal, remain closed.  The movie production industry has cancelled blockbuster holiday releases, and/or, is threatening to sell them to pay-per-view such as Netflix.  This would be financially devastating to the movie theater industry and to entities

such as QC which have a financial interest in seeing their tenants stay open and succeed.

### Defendants Ignored Plaintiff's Desperate Pleas.

12.     Plaintiff has attempted to work with the Defendants to address any public health concerns.  As early as August 2020, Plaintiff advised Defendants that it was critical to issue guidelines for theaters to reopen by October 1, 2020 inasmuch as that was the date that movie producers were expected to release new movies, *e.g., "No Time to Die"* a James Bond movie, in time for the holiday season.

13.     On September 10, 2020, Plaintiff submitted a 21-page detailed safety written protocol that comprehensively addressed all aspects of theater operations, including employees, patrons, ticket sales, concession sales, seating, security, training and other elements of health and safety.  A copy of the Regal COVID-19 Protocol is attached hereto as **Exhibit C.**

14.     Plaintiff continued to stress the October 1 deadline in communications with Defendants.  In a telephone conference held on September 16, 2020, Plaintiff wanted to discuss with the Defendants' representatives the Regal 21-page reopening plan previously submitted to Defendants.  Plaintiff informed Defendants that such plan had been successfully implemented in other states that had reopened theaters.  Despite having made it available on

September 10th, the Defendants admitted that they had not reviewed the plan prior to the telephone conference on September 16.  Plaintiff's urgent messages were being ignored.

15.    Defendants raised issues about congestion upon entering/exiting the theaters; ***those issues were addressed in the Regal plan***.

16.    Defendants raised issues about mask enforcement; ***those issues were address in the Regal plan***.

17.    Every single issue/concern mentioned by the Defendants was addressed in that conference, if not by the 21-page Regal plan previously submitted by Plaintiff.

18.    Plaintiff pointed out that the Governor had made a grave and incorrect assumption about theaters that wrongly influenced the Governor's arbitrary decision.  During a briefing on or about August 17, 2020, the Governor had stated that theaters will remain closed because they are "the least essential businesses that posed the most risk. . . It is congregant.  ***It is one ventilation system.*** . . .  You are seated there for a long period of time. . . . Even if you are at 50-percent capacity with one or two seats between the two of you, this is a risk situation. . . . " <u>Indie Wire</u>, August 17, 2020, at pp. 2-3 (emphasis added; a copy is attached hereto as **Exhibit D)**.

19.    The Governor's incorrect assumption that theaters share one HVAC unit formed a basis for his flawed decision.   However, at **_Plaintiff's Regal location, every theater has its own unit; meaning there are more than 20 HVAC units in operation in the building that houses the theater viewing screens_**.

20.    Plaintiff pressed the Defendants on the urgency of reopening due to the industry having made it clear that New York and California must reopen in order for the industry to release new films and financially survive.   Industry spokespersons pressed the Defendants.   Joe Masher, President of the National Association of Theater Owners of New York State said, "Desperation has set in now. . . ."   **Exhibit E,** https://nypost.com/2020/08/19/movie-theaters-could-be-next-on-gov-cuomos-reopening-list/, 8/19/20, at p.2.   Not one case of COVID-19 had been traced to movie theaters across 42 states that had reopened as of September 21, 2020.   **Exhibit F,** https://buffalonews.com/entertainment/movies/movie-theaters-remain-shrouded-in-darkness-we-never-thought-it-would-be-this-long/article_273b4896-f44c-11ea-ac44-f3319c4a4eea.html.   California reopened.   **_New York never did_**.

21.    The Regal theatres include leather recliner seats which permanently reduced the occupancy by 50% of its original occupancy limits.   The seats cannot

be relocated closer than they are presently configured.  The seats are numbered to correspond to advance ticketing which was addressed in the Regal plan.

22.     Planned occupancy would range from 18 to 28% with advance reserve tickets required.  Ticketing would be contactless.  A mechanism was implemented for contact tracing.  The filtration rate of the HVAC units was 13%, greater than the required Merv rating of 11%.  Concerns about the risk of patrons lowering the mask to eat popcorn is no greater than the risks of diners in a restaurant doing exactly the same thing.

23.     In the latest conference held on September 23, 2020, representatives from the Governor specifically commented that the DOH had noted that the "Regal protocol" looked very comprehensive and that they were close to "finalizing guidance".  Plaintiff again reminded Defendants that October 1, 2020 was a critical date because of the industry's decision to release new films for the holiday season.  In response, one of the Governor's representatives simply stated that he did not think he could "get it in front of the Governor before then."  In other words, the million-dollar losses facing New York businesses and the movie industry in general was not important enough for the Governor to review the Regal protocol in time to save the industry's staggering losses.  A copy of recent articles describing the financial devastation to the industry are attached hereto as **Exhibit G.**

24.     Despite the Defendants' claims that the shutdown was based on "public health data", no such data was ever produced to or discussed with Plaintiff.   The only responses provided by Defendants were entirely refuted by Plaintiff.   Defendants have never provided a **rational explanation** for their disparate treatment and none exists.

25.     And so the Governor's unconstitutional Executive Orders have now resulted in this: Regal just announced it is closing all 543 Regal Cinemas in the U.S. because "As major US markets, **mainly New York**, remained closed and without guidance on reopening timing, studios have been reluctant to release their pipeline of new films," the company said in a statement, adding that 45,000 employees would be affected.   "In turn, without these new releases, Cineworld cannot provide customers in both the U.S. and the U.K. – the company's primary markets – without the breadth of strong commercial films necessary for them to consider coming back to theatres against the backdrop of COVID-19." See, The Wrap News Article dated 10/5/2020 by Jeremy Fuster, at p.1, attached hereto as **Exhibit H**; emphasis added.

26.     Plaintiff is significantly affected by the Governor's orders.   Under threat of criminal penalties, QC's tenant has been forced to shut down its business, depriving QC of its liberty and property interests without due process. In addition, other tenants at QC's business have been financially impacted due

to the shut-down of the Regal theaters.  This financial impact has resulted in some tenants paying a reduced rent to QC.

27.    At the same time, without any justification, the Governor has allowed other "non-essential" businesses—of similar size and purpose -- to reopen under guidelines issued by the U.S. Center for Disease Control and Prevention ("CDC") and the DOH.  Plaintiff is fully capable of adhering to those same guidelines if allowed to reopen.  It has arbitrarily been denied the chance to do so.

28.    Although New York, like all states in the Union, is expressly guaranteed a republican form of government under Article IV, Section 4 of the U.S. Constitution, the Governor has unilaterally suspended civil liberties and announced that this state of affairs will continue indefinitely.  The "emergency" declared in March 2020 has long since expired.  ***Every other state has allowed movie theaters to open***.  A copy of a recent article reasoning that the Governor's dictatorial powers must end is attached hereto as **Exhibit I.**

29.    Plaintiff seeks a judicial declaration that the executive orders keeping movie theatres shut down (and all other orders, rules and enforcement activity related to them) are unconstitutional under the First Amendment, the Due Process Clause, the Equal Protection Clause and the New York State constitution.  Plaintiff brings this action to ensure that movie theaters are treated

equally with other similarly situated places of public assembly, and in order to exercise its First Amendment rights to exhibit films of significant artistic, cultural, political and popular merit.

30.     Plaintiff is also making a Takings Claim for just compensation required by the Fifth Amendment to the Constitution.  The Fifth Amendment requires that the government pay for property it takes: "Rights of Persons . . . nor shall private property be taken for public use, without just compensation." U.S. Constitution, 5th Amendment.  Lastly, the Executive Orders and the statutes under which they were issued are unconstitutional inasmuch as they violate the separation of powers and non-delegation doctrines.

31.     The issues raised in this Complaint will not be rendered moot if the Executive Orders are lifted before the Court issues judgment.  The issues presented here are novel, are capable of repetition and are of such importance that they cannot evade judicial review.

**THE PARTIES**

32.     Plaintiff QC is the owner of Quaker Crossing Retail Center ("QC Retail Center"), in Orchard Park, New York.  The QC Retail Center consists of 368,518 square feet of leasable area.  All of its commercial tenants are subject to a written lease agreement.  QC's leases permit QC to receive a gross percentage of sales revenue from its tenants.

33.    QC invested $7.5 million dollars to build the theaters known as the Regal Cinemas, Inc.. ("Regal") has leased approximately 76,670 square feet and operates 15 movie theaters in the QC Retail Center.  As part of the parties' leasing arrangement, in the past three (3) years, QC invested more than $2.5 million dollars to assist Regal to build a state-of-the-art theater facility.

34.    Because of the Governor's executive orders, Plaintiff has been forced to close the Regal movie theaters since March 16, 2020 through the date of filing of this Complaint.

35.    Defendant Andrew M. Cuomo is the Governor of the State of New York and signed Executive Order 202.3 on March 16, 2020 which ordered that all non-essential businesses close.  The Executive Order mandating the shut-down of movie theatres has been continued under the claimed authority of section 29-a of Article 2-B of the Executive Law.  The State Constitution requires that the Governor ensure that the laws of the state are "faithfully executed."  The Governor's office for the transaction of business is located at the New York State Capitol Building, Albany, New York 12224.  The Governor is sued herein in his official capacity.

36.    Defendant Letitia James, Esq. is the Attorney General of the State of New York, and pursuant to Executive Law § 60, is the head of the New York

State Department of Law and prosecutes and defends all actions in which the state has an interest, and has charge and control of all the legal business of the departments and bureaus of the state, or of any office thereof which requires the services of attorney or counsel to protect the interest of the State.  Ms. James is sued herein in her official capacity.

37.    Defendant Howard A. Zucker, M.D., J.D., is the Commissioner of the Department of Health of the State of New York ("DOH"), and is charged with issuing health and safety guidelines for the reopening of businesses that were closed due to the COVID-19 pandemic.  Mr. Zucker is sued herein in his official capacity.

### JURISDICTION AND VENUE

38.    This Court has subject matter jurisdiction over the claims asserted in this action pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1331 because this action arises under the First Amendment to the United States Constitution, the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution, and the Takings Clause of the Fifth Amendment to the United States Constitution.

39.    Jurisdiction also exists in this Court pursuant to 28 U.S.C. § 1343(a)(3) and (4) to redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege, or

immunity secured by the Constitution, and to secure equitable or other relief under any Act of Congress providing for the protection of civil rights.

40.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over the claims asserted under New York's Constitution, statutes, and regulations because Plaintiff's state constitutional claims are so related to its federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

41.     This Court has authority to award the requested injunctive relief under 28 U.S.C. § 1343 and Federal Rule of Civil Procedure 65, the requested declaratory relief under 28 U.S.C. §§ 2201-02 and Federal Rule of Civil Procedure 57, and damages and attorneys' fees under 28 U.S.C. § 1343, and 42 U.S.C. §§ 1983 and 1988.

42.     The Western District of New York is the appropriate venue for this action pursuant to 28 U.S.C. §§ 1391(b)(1) and (2) because it is a District in which Plaintiff has its principal offices, and in which Defendants maintain offices, exercise their authority in their official capacities, and have enforced the orders at issue in this case.  A substantial part of the events giving rise to the claim occurred in this District.

43.     There is a present and actual controversy between the parties.

## FACTUAL ALLEGATIONS

**A.      The COVID-19 Outbreak and the Movie Theater Business.**

44.      Regal is movie theater owner and operator who exhibits to the public films of significant artistic, cultural, popular and political merit.

45.      QC is a landlord who promotes Regal and the movie theater industry.  QC has a direct-dependent financial interest in Regal's operations and success.

46.      New York has been affected by the global outbreak of COVID-19.

47.      On March 7, 2020, the Governor issued Executive Order 202 (hereinafter "EO" shall refer to Executive Order), which declared a state of disaster emergency for the State of New York.  A copy is attached hereto as **Exhibit J**.

48.      EO 202 was issued under the auspices of section 29-a of Article 2-B of N.Y. Executive Law when that provision was hurriedly and secretly amended by the New York Legislature.  It states in pertinent part:

> "***Subject to the state constitution, the federal constitution and federal statutes and regulations***, the governor may by executive order temporarily suspend any statute, local law, ordinance, or orders, rules or regulations, . . . during a state disaster emergency, if compliance with such provisions would prevent, hinder, or delay action necessary to cope with the disaster or if necessary to assist

or aid in coping with such disaster. ***The governor, by executive order, may issue any directive during a state disaster emergency declared . . . . Any such directive <u>must be necessary</u> to cope with the disaster and may provide for <u>procedures reasonably necessary</u> to enforce such directive***." (emphasis added)

49.     EO 202.3, issued on March 16, 2020, closed all movie theaters in New York (Ex. A).  That EO has been continued through the present date.

50.     By Defendants' orders, movie theaters have been ordered to remain closed.  As a result, movie theaters have been unable to exhibit, and the public has been unable to view, any films that were slated to be released since March 16, 2020.

51.     Since March 2020, Regal has not paid its monthly rent of $133,454, CAM charges of $12,732, utility charges of $6,010, or any percentage of gross sales revenues.  Other tenants at QC's premises have paid reduced rent as a result of the financial impact caused by the continuing shut-down of the theaters.

52.     QC owes school taxes for fiscal year 2020/2021 due October 15 in the amount of $187,051.

53.   QC, by virtue of its commercial relationship with Regal, has suffered and will continue to suffer significant loss of income, loss of profits, and has had to lay off, furlough or reduce the hours of its employees.

54.   To date, QC has sustained damages in the amount of $1,216,371. Its monthly losses of $152,186 are continuing.

**B.   Governor Issues Orders Establishing Disparate Treatment of Like Places of Assembly.**

55.   Since March 16, 2020, the Governor has continued the shut-down of movie theaters.

56.   On June 6, 2020, by EO 202.38, the Governor permitted houses of worship to reopen at 25% capacity.  See, **Exhibit K.**

57.   On June 13, 2020, by EO 202.41, the Governor permitted all personal care services to reopen including salons, tattoo parlors, piercing parlors and related personal care services, as well as restaurants and food services.  See, **Exhibit L.**

58.   On June 26, 2020, by EO 202.45, the Governor permitted all businesses in Phase 4 to reopen, including higher education, low-risk indoor arts and entertainment and film/music production.  See, **Exhibit M.**

59.    On July 9, 2020, by EO 202.50, the Governor permitted indoor common portions of retail shopping malls to reopen.  See, **Exhibit N.**

60.    On August 20, 2020, by EO 202.57, the Governor permitted bowling alleys, gyms and fitness centers to reopen.  See, **Exhibit O.**

61.    On September 4, 2020, by EO 202.60, the Governor permitted casinos to reopen.  See, **Exhibit P.**

62.    As Chief Justice Roberts stated in <u>South Bay Pentecostal Church v. Newsom</u>, No. 19A1044, 590 U.S. ___ (May 29, 2020), "movie showings" are "comparable secular gatherings" to religious services, in that "large groups of people gather in close proximity for extended periods of time." There, the Supreme Court held that comparable treatment of places of worship and movie theatres in connection with reopening was consistent with the Free Exercise Clause of the First Amendment.

63.    The federal Centers for Disease Control and Prevention ("CDC") treats the following "Large Venues" together for purposes of reopening: "sit-down dining, movie theaters, sporting venues, places of worship." https://www.whitehouse.gov/openingamerica/.  The CDC recommends that such venues collectively be permitted to reopen, subject to social distancing requirements, as soon as any individual state or region meets certain gating

criteria. Notwithstanding the CDC's view that movie theatres and places of worship represent comparable risk levels, Defendants have already permitted reopening of places of worship, dining venues and casinos, yet have not even set a timetable for reopening of movie theatres.

64.     The Johns Hopkins University Center for Health Security ("CHS") has issued a document entitled "Public Health Principles for a Phased Reopening During           COVID-19:           Guidance           for           Governors." https://www.centerforhealthsecurity.org/our-work/pubs_archive/pubs-pdfs/2020/200417-reopening-guidance-governors.pdf. This guidance indicates that places of worship present a *greater* public health risk relating to COVID-19 than "theaters, museums, and other indoor leisure spaces." CHS explains that the latter category, which includes movie theatres, has **medium** "contact intensity," defined as a "function of contact type (ranging from close to distant) and duration (ranging from brief to prolonged)." In contrast, places of worship have a **high** contact intensity. Both categories are identical in terms of "number of contacts" and "modification potential" (*i.e.,* "the degree to which mitigation measures can buy down [COVID-19] risks").

65.     Other public health experts have similarly rated places of worship as more risky than movie theatres, highlighting the increased risks posed by singing     in     places     of     worship.     https://www.mlive.com/public-interest/2020/06/from-hair-salons-to-gyms-experts-rank-36-activities-by-

coronavirus-risk-level.html?outputType=amp.     Unlike  attendees  at  places  of

worship, movie theatre guests generally do not engage with those outside their

immediate groups to have conversations, hold or shake hands, hug, sing, provide

verbal responses, do responsive readings, or engage in other forms of contact

regularly engaged in at places of worship.  Indeed, speaking and singing during

the performance is not allowed in movie theatres.  Nor are there shared books or

documents or frequent sitting, standing and kneeling in movie theatres.


66.     There is no rational basis for the distinction Defendants have drawn,

for example, between places of worship and movie theatres, both places of public

assembly.  In fact, many churches lacking a building of their own, or lacking the

capability to safely host religious services during this period, hold their religious

services  in  movie  theatres.     An  example  is  the  Cinemark  Theatre  Church

program.   https://www.cinemark.com/private-events/theatre-church/.   Under

Defendants'  orders,  a  movie  theatre  could  host  religious  services  on  Sunday

morning  but  would  have  to  close  showing  movies  on  Sunday  afternoon  to  an

audience of the same size in the same auditorium following the same distancing

requirements.  As another example, a church group could watch a religiously-

themed movie in a movie theatre as part of its religious ceremonies but the same

theatre cannot show the same film to a general audience of the same size that

same  day  in  the  same  auditorium  and  following  the  same  distancing

requirements.

67.    The impact of Defendants' orders, coupled with the Defendants' purported justification for the closure of movie theatres (that there are other and virtual ways to watch movies), shows Defendants' overt hostility to movie theatres' speech and expression, as compared to other forms of speech and expression.

68.    In line with the empirical data, 49 states have already allowed opened movie theatres.

69.    Plaintiff has presented detailed, comprehensive safety plans for the reopening of movie theatres in New York that Plaintiff is ready, willing, and able to implement. The proposed protocols meticulously address all aspects of theatre operations, including employees, patrons, ticket sales, concessions sales, seating, security, training, and other elements of health and safety.

70.    Rather than address these comprehensive safety proposals in any meaningful way, Defendants have chosen to continue to discriminate against movie theatres and to continue to require the closure of indoor movie theatres. Other than asserting that they are "following the science", not a shred of evidence has ever been presented by Defendants.

71.    Plaintiff understands Defendants' goal of protecting the health and safety of New York residents and mitigating the risk of the spread of COVID-19.

But having concluded that it is in the interests and welfare of New York residents to permit the reopening of businesses, Defendants must apply the law to similar entities and activities in a similar fashion.  Defendants violate the guarantee of equal treatment under the law by refusing to permit movie theatres to reopen, while other similar entities have been allowed to reopen after the "curve was flattened."

72.    On June 24, 2020, the Governor told the press in his daily conference that, "we are continuing to study malls, movie theaters and gyms." And yet, over 3 months later, nothing has changed and the Governor has failed to explain or justify the continued shutdown of movie theaters.

73.    The Governor boasted on CNN on June 25, 2020: "What we're saying in New York, look we did the right thing and New Yorkers paid a terrible cost as you know, Alisyn.  They have been locked up.  They have been closing their businesses.  ***We have the virus under control finally.  We had to flatten the curve***."  See, **Exhibit Q** at p.3; emphasis added.

74.    Despite the flattening of the curve, movie theatres continue to suffer a total loss of revenue and profits due to Defendants' shutdown orders. Landlords such as QC have been financially impacted by these shut-downs. These losses increase each day and will continue to rise as 2020 rolls into 2021. Due to New York's failure to even address movie theater reopening as part of its

phased reopenings, the movie exhibition industry has already shuttered the fall cinema season.

75.     As a result of the ongoing forced closures, movie theatres are suffering considerable and ongoing harm, including injuries to their businesses, reputations, and relationships with customers, vendors, and employees. Defendants have not provided for or offered compensation to the State's movie theatres in exchange for the regulatory taking of their properties.

76.     In addition to financial loss, Defendants' continued orders keeping movie theatres closed infringe significantly on Plaintiff's rights of free speech and expression because they are prevented by Defendants' orders from showing films to members of the public.

77.     Movie theatre owners are ready, willing and able to comply with any and all requirements for reopening promulgated by Defendants for comparable enterprises, such as places of worship, restaurants and casinos.

## FIRST CLAIM FOR RELIEF
### (Violation of the Equal Protection Clause of the Fourteenth Amendment)

78.     Plaintiff incorporates by reference and reallege each and every allegation in Paragraphs 1 through 77, as if fully set forth herein.

79.    "When those who appear similarly situated are nevertheless treated differently, the Equal Protection Clause requires at least a rational reason for the difference, to ensure that all persons subject to legislation or regulation are indeed being 'treated alike, under like circumstances and conditions.'" Engquist v. Ore. Dep't of Agric., 553 U.S. 591, 601 (2008).

80.    Where the classification impinges on fundamental rights, including those protected by the First Amendment or the right to Due Process, the differential treatment is subjected to strict scrutiny under the Equal Protection Clause. San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 17 (1973). As described more fully below, Defendants have violated Plaintiff's First Amendment and Due Process rights under the Fourteenth Amendment; thus, the orders closing movie theatres are subject to strict scrutiny. The orders cannot satisfy strict scrutiny because the distinction between places of worship and other places of public assembly versus movie theatres is arbitrary, and not narrowly tailored to further compelling government interests.

81.    Defendants' orders cannot survive any level of scrutiny. The orders distinguish between places of worship and other places of public assembly versus movie theatres without any rational reason and thus cannot satisfy even rational basis review.  The "curve" has been flattened and the virus is under control in New York State.  Nor are the Defendants' orders reasonably related to a legitimate governmental interest.

82.    Accordingly, Plaintiff seeks a declaration that Defendants' orders violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

83.    Plaintiff has no adequate remedy at law and will suffer serious and irreparable harm unless Defendants are permanently enjoined from implementing and enforcing the orders, to the extent they allow places of worship or other comparable places of public assembly to open before movie theatres.

84.    Plaintiff also seeks money damages in an amount exceeding $1 million dollars, plus attorneys' fees, costs and disbursements.

**SECOND CLAIM FOR RELIEF**
**(Violation of Equal Protection Clause**
**Under New York State Constitution)**

85.    Plaintiff incorporates by reference and reallege each and every allegation in Paragraphs 1 through 84 as if fully set forth herein.

86.    Article 1 § 11 of the New York State Constitution states that "No person shall be denied the equal protection of the laws of this state or any subdivision thereof."

87.    By classifying businesses into essential v. non-essential, the Defendants are treating like businesses differently.

88.    Defendants failed to provide any remedy to challenge the classification.

89.    Defendants' Executive Orders continue to treat similarly-situated businesses in a disparate, arbitrary manner since like businesses including gyms, places of worship, museums, health spas, casinos and the like, have been permitted to reopen.

90.    Accordingly, Plaintiff seeks a declaration that Defendants' orders violate the Equal Protection Clause of the New York Constitution.

91.    Plaintiff has no adequate remedy at law and will suffer serious and irreparable harm unless Defendants are permanently enjoined from implementing and enforcing the orders, to the extent they allow places of worship or other comparable places of public assembly to open before movie theatres.

92.    Plaintiff also seeks money damages in an amount exceeding $1 million dollars, plus attorneys' fees, costs and disbursements.

## THIRD CLAIM FOR RELIEF
### (Violation of Freedom of Speech and Expression under the First Amendment)

93.     Plaintiff incorporates by reference and reallege each and every allegation in Paragraphs 1 through 92, as if fully set forth herein.

94.     The First Amendment to the United States Constitution guarantees that "Congress shall make no law ... abridging the freedom of speech..." The First Amendment also applies to the States, including New York, and their officials.

95.     The orders challenged herein abridge Plaintiff's freedom of speech and expression by preventing the exhibition of movies of significant artistic, cultural, popular, and political merit. As to movies, the Supreme Court has recognized, "It cannot be doubted that motion pictures are a significant medium for the communication of ideas. They may affect public attitudes and behavior in a variety of ways, ranging from direct espousal of a political or social doctrine to the subtle shaping of thought which characterizes all artistic expression. The importance of motion pictures as an organ of public opinion is not lessened by the fact that they are designed to entertain as well as to inform.... [E]xpression by means of motion pictures is included within the free speech and free press guaranty of the First and Fourteenth Amendments" Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 501 (footnote omitted), 502 (1952). With respect to owners and operators of movie theatres, the Supreme Court has recognized that they are "often those with the highest interest and the largest stake in a First

Amendment controversy." Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 505 n.11 (1981).

96.    Defendants' orders challenged herein are a categorical prohibition of Plaintiff's rights to free speech and free expression protected by the First Amendment. The orders are a prior restraint on speech and expression, which constitute "the essence of censorship." Near v. Minnesota, 283 U.S. 697, 713 (1931), and "the most serious and the least tolerable infringement on First Amendment rights." Nebraska Press Ass'n v. Stuart, 427 U.S. 51, 57 (1965). "The administration of a censorship system for motion pictures presents peculiar dangers to constitutionally protected speech." Freedman v. Maryland, 380 U.S. 51, 57 (1965).

97.    Defendants' orders have prevented, and continue to prevent, the exhibition to the public of films of significant artistic, cultural, political and popular merit.  In addition, Defendants' orders, which allow, for example, places of worship to reopen while forbidding movie theatres from reopening, constitute an overt governmental preference for one protected message over other protected messages.  In fact, Defendants' orders, for example, allowing shopping malls to reopen, while requiring movie theatres to remain closed, demonstrates a preference for unprotected activities over protected speech.

98.   This violation of the First Amendment to the United States Constitution has caused proximate and legal harm to Plaintiff.

99.   Plaintiff seeks a declaration that the orders violate the First Amendment to the United States Constitution.

100.   Plaintiff has no adequate remedy at law and will suffer serious and irreparable harm unless Defendants are enjoined from implementing the orders, to the extent they allow require movie theatres to remain closed and not exhibit films after comparable places of public assembly have been allowed to reopen.

101.   Plaintiff also seeks money damages in an amount exceeding $1 million dollars, plus attorneys' fees, costs and disbursements.

### FOURTH CLAIM FOR RELIEF
### (Violation of Substantive Due Process – U.S. Constitution)

102.   Plaintiff incorporates by reference and reallege each and every allegation in Paragraphs 1 through 101, as if fully set forth herein.

103.   The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."  A State violates this guarantee of due process by depriving one of property under a law "so vague that it fails to give ordinary people fair notice

of the conduct it punishes, or so standardless that it invites arbitrary enforcement." <u>Johnson v. United States</u>, 135 S. Ct. 2551, 2556 (2015).

104. The Due Process Clause applies to states and protects individuals against majoritarian policy enactments that exceed the limits of governmental authority, regardless of whether the processes of enactment and enforcement are fair.

105. Citizens have fundamental rights of free speech, liberty, property and the right to assemble peaceably. When those rights are abridged by states and the consequences are particularly harsh and oppressive, the laws are unlawful regardless of whether the process for review is fair. <u>U.S. Trust Co. of N.Y. v. New Jersey</u>, 431 U.S. 1, 17 (1977); <u>United States v. Carolene Products, Co.</u>, 304 U.S. 144 (1938).

106. Defendants' orders, which distinguish between places of worship or other comparable entities and movie theatres, are standardless and invite arbitrary enforcement. There is no rational basis to distinguish between these similarly situated venues, and Defendants have offered no explanation for this distinction. Any enforcement of the orders that prohibits movie theatres from reopening, while allowing other similarly-situated places of public assembly, such as places of worship, to reopen, is an arbitrary violation of Plaintiff's rights to due process.

107.   Plaintiff seeks a declaration that the orders' arbitrary distinctions between places of worship and movie theatres violate the Substantive Due Process Clause of the Fourteenth Amendment to the United States Constitution.

108.   Plaintiff has no adequate remedy at law and will suffer serious and irreparable harm unless Defendants are enjoined from implementing and enforcing the orders, to the extent they allow places of worship or other comparable entities to open before movie theatres.

109.   Plaintiff also seeks money damages in an amount exceeding $1 million dollars, plus attorneys' fees, costs and disbursements.

## FIFTH CLAIM FOR RELIEF
### (Violation of Procedural Due Process – U.S. Constitution)

110.   Plaintiff incorporates by reference and reallege each and every allegation in Paragraphs 1 through 109, as if fully set forth herein.

111.   Defendants have violated the Due Process Clause in that their orders fail to provide any meaningful procedure for challenging the determination that similarly-situated entities and activities are subject to disparate treatment by the City and State. Logan v. Zimmerman Brush Co., 455 U.S. 422 (1982).

112.   Plaintiff seeks a declaration that the orders' arbitrary distinctions between places of worship and movie theatres violate the Procedural Due Process Clause of the Fourteenth Amendment to the United States Constitution.

113.   Plaintiff has no adequate remedy at law and will suffer serious and irreparable harm unless Defendants are enjoined from implementing and enforcing the orders, to the extent they allow places of worship or other comparable entities to open before movie theatres.

114.   Plaintiff also seeks money damages in an amount exceeding $1 million dollars, plus attorneys' fees, costs and disbursements.

### SIXTH CLAIM FOR RELIEF
### (Violation of the Takings Clause of the Fifth Amendment)

115.   Plaintiff incorporates by reference and reallege each and every allegation in Paragraphs 1 through 114, as if fully set forth herein.

116.   The Takings Clause of the Fifth Amendment states, "nor shall private property be taken for public use, without just compensation." The Clause applies to the States via the Fourteenth Amendment.

117.   The actions taken by Defendants have resulted in Plaintiff being deprived of the economically beneficial and productive use of their property, resulting in the involuntary closing of their businesses.

118. Defendants' orders constitute regulatory takings of Plaintiff's property without just compensation in violation of the Takings Clause of the Fifth Amendment to the United States Constitution. At a minimum, the effect of Defendants' orders constitutes a "partial" taking as recognized in <u>Penn Cent. Transp. Co. v. City of New York,</u> 438 U.S. 104 (1978).  This violation of the Takings Clause has caused proximate and legal harm to Plaintiff.

119.  Accordingly, Plaintiff seeks a declaration that the orders violate the Takings Clause of the Fifth Amendment to the United States Constitution and that Plaintiff is entitled to compensation for its economic loss as a result of the taking.

120.  Plaintiff has no adequate remedy at law and will suffer serious and irreparable harm unless Defendants are enjoined from implementing and enforcing the orders, to the extent they allow places of worship and other comparable entities to open before movie theatres.

121.  Plaintiff also seeks money damages in an amount exceeding $1 million dollars, plus attorneys' fees, costs and disbursements.

## SEVENTH CLAIM FOR RELIEF
### (Violation of Separation of Powers/Nondelegation Doctrine)

122.  Plaintiff incorporates by reference and reallege each and every allegation in Paragraphs 1 through 121, as if fully set forth herein.

123.  The New York Constitution provides for distribution of powers among three (3) branches of government (Article III § 1 [legislative]; Article IV § 1 [executive]; Article VI [judiciary].  "The legislative power of this state shall be vested in the senate and assembly."  Art. III, § 1.

124.  "'This distribution avoids excessive concentration of power in any one branch or in any one person.  Where power is delegated to one person, the power is always guided and limited by standards. . . .Without such standards there is no government of law, but only government by men left to set their own standards,        with        resultant        ***authoritarian        possibilities.***'" https://www.avvo.com/legal-guides/ugc/separation-of-powers-under-new-york-state-law#, Dapelo, R. (2010), at p.1, citing Rapp v. Carey, 44 N.Y.2d 157, 162 (1978).

125.  Accordingly, Plaintiff seeks a declaration that the orders violate the Separation of Powers and Nondelegation Doctrines of the New York Constitution.

126.  Plaintiff has no adequate remedy at law and will suffer serious and irreparable harm unless Defendants are enjoined from implementing and

enforcing the orders, to the extent they allow places of worship and other comparable entities to open before movie theatres.

127.   Plaintiff also seeks money damages in an amount exceeding $1 million dollars, plus attorneys' fees, costs and disbursements.

## EIGHTH CLAIM FOR RELIEF
### (Violation of New York Constitution, Article I § 7)

128.   Plaintiff incorporates by reference and reallege each and every allegation in Paragraphs 1 through 127, as if fully set forth herein.

129.   The New York Constitution provides that "Private property shall not be taken for public use without just compensation."  Art. I, § 7.

130.   Plaintiff has property interests in the Regal movie theatre facilities. Prohibiting them from reopening while allowing similarly situated entities to do so, and without recourse or protection from arbitrary enforcement of Defendants' orders, constitutes a taking of Plaintiff's property under the New York Constitution.

131.   Plaintiff seeks a declaration that the orders violate the New York Constitution and that Plaintiff is entitled to compensation for their economic loss as a result of Defendants' taking.

132.   Plaintiff has no adequate remedy at law and will suffer serious and irreparable harm unless Defendants are enjoined from implementing and enforcing the orders.

133.   Plaintiff also seeks money damages in an amount exceeding $1 million dollars, plus attorneys' fees, costs and disbursements.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

1.    For a declaratory judgment that Defendants' orders, which establish disparate treatment of similarly-situated entities, constitute violations of Plaintiff's rights under the United States and New York Constitutions to equal protection and due process, and constitutes an unlawful taking without just compensation;

2.    For a declaratory judgment that Defendants' orders and Executive Law § 29-a as amended violate the doctrines of separation of powers and non-delegation under the New York Constitution;

3.    For a declaratory judgment that Defendants' actions violate the First Amendment rights of freedom of speech and expression of Plaintiff;

4.    For permanent injunctive relief barring and prohibiting Defendants' from enforcing Defendants' orders against Plaintiff to the extent that they do not allow Plaintiff to reopen movie theaters;

5.     For a declaratory judgment that Plaintiff should be treated in the same manner as comparable entities under Defendants' orders, and permitted to reopen as other comparable places of public assembly have been allowed;

6.     For a declaratory judgment that Defendants' actions constitute a deprivation of just compensation due to the economic loss they have imposed upon Plaintiff;

7.     For a judgment awarding Plaintiff its damages in an amount exceeding $1 million dollars as will be established at trial;

8.     For reasonable attorneys' fees and costs in the prosecution of this action pursuant to law; and

9.     For such other and further relief as the Court deems just and equitable.

## JURY TRIAL DEMANDED

Dated:     October 12, 2020
           Buffalo, New York

**DUKE HOLZMAN PHOTIADIS & GRESENS LLP**
*Attorneys for QC Properties, LLC*

Gregory P. Photiadis, Esq.
Patricia Gillen, Esq.
701 Seneca Street, Suite 750
Buffalo, New York 14210
(716) 855-1111
gpp@dhpglaw.com
pgillen@dhpglaw.com